# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

Information associated with patrick@northridgelabs.org, that is stored at premises controlled by HostGator.com LLC, a company that accepts service of legal process at 5005 Mitchendale, Suite 100, Houston, TX 77092, more particularly described in Attachment A. .

)
)
)
)
)
)

Case No. 17-M-1256

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

Information associated with patrick@northridgelabs.org, that is stored at premises controlled by HostGator.com LLC, a company that accepts service of legal process at 5005 Mitchendale, Suite 100, Houston, TX 77092, more particularly described in Attachment A.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:
18 U.S.C. §1343 (fraud by wire) and 18 U.S.C.§1001 (false statements)

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

 Frederick Lane, VA OIG Special Agent_____
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: 5/10/17

_____
*Judge's signature*

UNITED STATES DISTRICT COURT )

EASTERN DISTRICT OF WISCONSIN )

## AFFIDAVIT

I, Frederick Lane, being duly sworn and under oath state the following:

## INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent with the Department of Veterans Affairs, Office of Inspector General (VA OIG). I have been employed by the VA OIG since August 2010. I am currently assigned to the VA OIG Central Field Office – Hines, Illinois. I have been a Special Agent for more than 13 years at the VA OIG and other Federal Inspectors General. My prior law enforcement experience includes 14 years with the Chicago Police Department as a police officer and sergeant, where I served in investigative roles. I have conducted and participated in criminal investigations utilizing normal investigative methods, including but not limited to the following: writing affidavits for and executing search warrants, collecting and analyzing evidence, analyzing documents, and interviewing witnesses.

2.     I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises controlled by HostGator.com, LLC (hereinafter "HostGator"), an e-mail provider headquartered at 5005 Mitchendale, Suite 100, Houston, Texas. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(l)(A) and 2703(c)(l)(A) and Federal Rule of Criminal Procedure 41 to require HostGator to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3.     The facts set forth in this Affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; review of documents and records related to this

investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation. The summaries of conversations included in this affidavit do not include all potentially criminal conversations during this investigation, or all statements or topics covered during the course of the conversation. All quoted conversations in this affidavit do not represent finalized transcripts and may not represent the entire conversation that occurred between the identified individuals.

4.       Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, U.S.C. § 1343 (fraud by wire) and Title 18, U.S.C. § 1001 (false statements) have been committed by Patrick R. Budic, principal of Northridge National Laboratory located in Milwaukee, Wisconsin. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband and/or fruits of these crimes further described in Attachment B.

## SUMMARY OF INVESTIGATION

5.       A joint investigation conducted by myself and participating federal agents has uncovered facts establishing probable cause that Patrick R. Budic has used, caused, or has facilitated the use of the email accounts listed directly below (hereinafter collectively referred to as the "Subject Email Accounts") in furtherance of his scheme to fraudulently obtain equipment from the U.S. Government that originally cost over $615,000 (though in Budic's estimation, discussed later in this affidavit, this figure is over $11,000,000):

      a.   patrick@northridgelabs.org

      b.   patrick@pmrmarine.com

6.       Budic resides in an apartment located in West Allis, Wisconsin. Budic's rental of this apartment is subsidized by the Department of Veterans Affairs, Housing and Urban Development – Veterans Affairs Supportive Housing program. This housing program is a Housing and Urban Development Section 8 program that provides housing to homeless veterans, or veterans at risk for becoming homeless.

2

7.      Budic advertises himself as the "acting director" of Northridge National Laboratory and our investigation has confirmed that Budic and a U.S. Navy engineer of San Diego, California, named David G. Rousseau, are the principals of Northridge National Laboratory. According to statements made to U.S. Government agencies by Budic, Northridge National Laboratory is a 501(c)(3) nonprofit science, technology, and education corporation engaged in research and development projects pertinent to national security and defense, under 26 U.S.C. §501(c)(3).

8.      Northridge National Laboratory (hereinafter referred to as "NNL") was incorporated within the State of Wyoming. A special agent assigned to this investigation has reviewed records obtained from the Business Division, Secretary of State, Wyoming, which described NNL as a non-profit corporation. Within these records, the Principal Address and Mailing Address were the same: 7740 W. Greenfield Avenue Unit 44101, Milwaukee, WI 53214-6134. Our investigation has revealed that this address is a Post Office Box within a U.S. Post Office. The incorporator for NNL was Patrick R. Budic and he was also named a Director along with David G. Rousseau (also named Director). Also, a special agent assigned to this investigation contacted the Business Registrar for the State of Wyoming and was told that her office was not a regulatory agency and did not verify information provided by the incorporator. She further stated that NNL's listing as a nonprofit was based upon their claim to be a nonprofit and was not further verified by the Wyoming Secretary of State.

9.      PMR Research and Development Group, LLC (hereinafter referred to as "PMR") is a commercial enterprise that was owned and operated by Patrick Budic. PMR was registered in the U.S. General Services Administration, System for Award Management (a database maintained by GSA that contains data, representations, and certifications provided by entities wishing to conduct business with the U.S. Government) in August 2006 as a for profit, service-disabled veteran owned business. Budic was listed within the PMR entity record within the System for Award Management as PMR's president and point of contact at **patrick@pmrmarine.com** and pbudic@pmrmarine.com. The PMR entity record in SAM expired in October 2013.

10.     There is probable cause to believe that evidence, fruits, and instrumentalities of this scheme will be found within the Subject Email Accounts. In particular, that from in or around March 2013 to the present, Budic, aided in part through the Subject Email Accounts, has

fraudulently acquired and, in some instances, facilitated the sale of U.S. Government equipment declared to the U.S. General Services Administration (hereinafter referred to as "GSA") as excess to government needs. Generally, as more fully set forth herein, I believe there is probable cause to establish that Budic would do the following:

    a.  Make statements to government officials, creating a false impression as to NNL's affiliation with U.S. Government agencies.

    b.  As required, submit requests and statements in the form of interstate electronic wire transmissions through the systems of HostGator to obtain U.S. Government owned equipment;

    c.  Submit false statements leading U.S. Government officials to believe that he represented a functioning scientific laboratory engaged in sensitive projects sanctioned by the U.S. Government. When questioned about these projects, Budic would submit further false statements leading these same officials to believe the projects were deemed so sensitive by the U.S. Government that Budic could not provide detail as to the project, the use of the requested equipment in furtherance of the project, or describe the facility used to undertake the project.

    d.  Sell equipment he fraudulently obtained, aided by a medical equipment reselling business located in Petersburg, Virginia.

## LEGAL BACKGROUND

    11.    Federal "Excess" property is property assigned to a federal agency or department that is no longer needed to carry out official agency activities, functions, and programs. Title 40 of the United States Code, Section 521, authorizes the GSA to prescribe policies to promote the maximum use of Excess personal property. In addition, the Federal Management Regulations promote the use of Excess personal property to the fullest extent possible to conserve public funds. These regulations are found at 41 Code of Federal Regulations (CFR) §§ 102-36.5 et seq. (Excess personal property hereinafter referred to as "excess property"). Federal Management Regulations (41 C.F.R. §§ 102-36.35) define the typical process for disposing of excess property as follows:

    a.  You must ensure personal property not needed by your activity is offered for use elsewhere within your agency. If the property is no longer needed by any activity

4

within your agency, your agency declares the property excess and reports it to GSA for possible transfer to eligible recipients, including federal agencies for direct use or for use by their contractors, project grantees, or cooperative agreement recipients. All executive agencies must, to the maximum extent practicable, fill requirements for personal property by using existing agency property or by obtaining excess property from other federal agencies in lieu of new procurements.

b.  If GSA determines that there are no federal requirements for your excess property, it becomes personal surplus property ("surplus property") and is available for donation to state and local public agencies and other eligible non-federal activities. Title 40 of the United States Code requires that surplus property be distributed to eligible recipients by an agency established by each State for this purpose, the State Agency for Surplus Property.

c.  Surplus property not selected for donation is offered for sale to the public by competitive offerings such as sealed bid sales, spot bid sales, or auctions. You may conduct or contract for the sale of your surplus property, or have GSA or another executive agency conduct the sale on behalf of your agency in accordance with 41 C.F.R. § 102-38. You must inform GSA at the time the property is reported as excess if you do not want GSA to conduct the sale for you.

d.  If a written determination is made that the property has no commercial value or the estimated cost of its continued care and handling would exceed the estimated proceeds from its sale, you may dispose of the property by abandonment or destruction, or donate it to public bodies.

12.  "GSAXcess" is a website (http://gsaxcess.gov/) on the Internet maintained by GSA and is used for reporting, searching, selecting and screening excess property. GSAXcess is the entry site for the federal excess property utilization program and the federal surplus property donation program operated by GSA. Agencies can report excess property for transfer by GSA to other federal and state agencies for surplus property, as well as search for and obtain excess property. Agencies can also report and transfer excess computers and peripheral equipment to schools and educational nonprofit organizations through the Computers for Learning program or post Computers for Learning transfers completed outside of the system. The site is not intended

5

for the general public. The data comprising the GSAXcess website is located on servers operated by GSA contractor UNISYS, primarily located at 3199, Pilot Knob Rd., Eagan, Minnesota, with a redundant back-up server site in Salt Lake City, Utah. All access to the GSAXcess website from computers anywhere other than in Minnesota and Utah necessarily involves the use of interstate wire communications.

13. The "Stevenson-Wydler Technology Innovation Act of 1980," or the "Stevenson-Wydler Act," establishes that "the Federal Government shall strive where appropriate to transfer federally owned or originated technology to State and local governments and to the private sector." 15 U.S.C. § 3710(a). Section 3710(i), a portion of what is generally referred to as the "Stevenson-Wydler Technology Innovation Act of 1980" or the "Stevenson-Wydler Act," provides as follows:

> "The Director of a laboratory, or the head of any Federal agency or department, may loan, lease, or give research equipment that is excess to the needs of the laboratory, agency, or department to an educational institution or nonprofit organization for the conduct of technical and scientific education and research activities. Title of ownership shall transfer with a gift under this section."

The Act [15 USC § 3703(3)] defines a nonprofit as, "an organization owned and operated exclusively for scientific or educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual."

## FACTS SUPPORTING PROBABLE CAUSE

### Budic Statements to Government Officials

Budic Statements Related to NNL Facilities

14. In October 2014, a property technician for the Nez Perce National Forest in Kamiah, Idaho told a U.S. Forest Service special agent that the property technician had been contacted by Patrick Budic, Acting Director of NNL. The property technician stated Budic had requested the transfer of six aircraft radios and one GPS unit that the Forest Service had deemed as excess property. According to the property technician, Budic stated NNL operated a 140-acre research facility and conducted sensitive research for the Department of Defense.

6

15.     In August 2014, a GSA Supervisory Property Disposal Specialist in Auburn, Washington, was contacted by Patrick Budic of NNL. Budic contacted the property disposal specialist to discuss aircraft he had requested from the Department of Defense for NNL. During this telephone call, the property disposal specialist asked Budic, "Northridge National Laboratory is not actually a Federal National Laboratory, correct?" The property disposal specialist provided a GSA Office of Inspector General ("OIG") special agent with a summary of Budic's response to this question, which stated:

> "He confirmed that it is 'not a Federal laboratory yet but it is on its way. This is how we get there.' He claimed they have their 501(c) and that Northridge National Laboratory is in the works to become an official national laboratory. It has 120 laboratories on a 110 acre complex and has many scientists and engineers working on projects for various military entities. He claimed that he is a scientist, as well, and that he and one other person head the company and were both vice-principals of the company. He made no mention of the principal.
>
> He claimed that NNL has mostly top secret research projects with the U.S. military and they conduct energy research, which is why people cannot visit his facility. He said that 95% of the equipment he receives under the Stevenson-Wydler Act and 15 C [sic] 3710(i) comes directly from the military. He said that he has had meetings with DLA[1], JAG, the U.S. Attorney's Office (and named several other entities of which I cannot recall) and all agree, especially the U.S. Attorney's Office, that 15 U.S.C. § 3710(i) is very clear that Federal agencies are required to donate property under that regulation first when a known interest is in place."

16.     On September 8, 2014, a GSA OIG special agent undercover as a GSA property disposal specialist made a recorded telephone call to Patrick Budic, at (414) 456-9300, from Auburn, Washington. The undercover agent called under the guise of inquiring about Budic's request for excess aircraft from various federal agencies, as well as inquiring into Budic's past acquisitions of excess property for NNL. Budic and the undercover agent had corresponded via email several times prior to the call on this same date. Each of the email messages was sent to or received from **patrick@northridgelabs.org**. The final email message Budic sent to the

---

[1] Affiant reasonably believes Budic's reference to "DLA" is the Defense Logistics Agency.

7

undercover agent asked him to call Budic to discuss the excess property. During the call, the undercover agent asked Budic where the requested aircraft would be stored. Budic replied, "we're" five different facilities nationally and the main facility was in Wisconsin and was over one million square feet, 110 acres, with 130 laboratories. Budic referred to having more pilots than he knew what to do with and said one of the aircraft's intended use was for a Department of Defense Special Operations project.

17.     On March 8, 2016, a GSA OIG and a Defense Criminal Investigative Service (DCIS) special agent interviewed Patrick Budic. The interview took place at a DCIS office in Milwaukee, Wisconsin. The interview was set-up at the request of Budic, who wanted to discuss a complaint about government interference in NNL's acquisition of federal excess property. The interview was non-custodial. The interviewing agents asked Budic if they could record the interview, and Budic gave consent after calling Rustine Johnson, who was working as a security specialist for NNL. Johnson was also a party to the interview, participating via telephone loudspeaker; Johnson also consented to the recording of the interview. During this interview, the agents brought up the September 2014 conversation described in the preceding paragraph. The agents asked Budic where the over one million square feet, 110 acre NNL facility with 130 laboratories was located in Wisconsin. Budic replied that NNL was in the process of acquiring it. The agents confronted Budic, reminding him that was not what he told the government official he was talking to in September 2014, that in fact, he had told the government official that NNL had the facility. Budic responded that an offer made by NNL to purchase the Northridge Mall in Wisconsin had been accepted at the time he told the government official that NNL had the facility. He further stated that this offer was later rejected and NNL had not purchased the facility. When the agents further confronted Budic by stating that a mall would not have 130 laboratories in it, Budic responded that the Northridge Mall had 139 spaces that are cleared out and that it was like any other building at the time of the interview.

18.     During the March 2016 interview of Budic, when asked by the interviewing agents where all of the equipment NNL had obtained from the U.S. Government was located, Budic vaguely referred to a storage facility called "armory." He claimed to not know where it was or the full name of the facility during the interview, only stating it was a large building down on Canal, near the Amtrak station and needing a passcode for access. Budic stated most of the stuff NNL had acquired was at the armory, while some of it was in California. He said it was

8

ultimately supposed to go up to the Northridge Mall site. He also said they were short on the rent for the month and were locked out of the facility. Budic said that he also had personal affects at the storage facility and that he had had to pay for all of the storage. After the interview, the interviewing agents located Armour Self Storage in Milwaukee, Wisconsin, that seemed to fit the description provided by Budic.

19.     On March 9, 2016, special agents assigned to this investigation confirmed that Budic rented space from Armour Self Storage, and agents observed Budic park in front of the facility and enter the facility office. He later exited the office and left the facility. After Budic left, the observing agents entered the facility office and interviewed the facility manager. According to the manager, Budic had asked questions about what information others could find out about his storage unit and asked what steps others could take to get into his storage unit. Budic requested a printout of his bill, the manager stated Budic was commonly behind on his bill and was currently locked out of his storage unit. Budic told the manager that there were computers and supercomputers stored in the storage unit, and that there was his personal property, as well as business property, stored in the unit. The manager would not allow Budic to access his unit without paying the bill. The manager recalled that approximately one to two weeks prior, Budic had showed the manager the contents of Budic's storage locker and offered the manager a laptop. The manager stated Budic had previously offered another tenant a laptop as well. The manager observed the contents of Budic's storage locker to include the following:

a.  A long, large printer;

b.  Approximately five to seven old laptops;

c.  Various Dell docking stations;

d.  12 to 14 servers, 6 to 8 on one side of the unit, 4 on the other side of the unit;

e.  One additional computer tower, maybe a small server. Budic referred to this computer as coming from a branch of the military; and

f.  A large quantity of other items the manager only referred to as, "a lot of other stuff."

Budic Statements Related to 501(c)(3) Status of NNL

20.     On October 21, 2013, a U.S. Department of Commerce, National Oceanic and Atmospheric Administration (hereinafter referred to as "NOAA") property officer stationed in

Seattle, Washington, received an email from Budic's email account,

**patrick@northridgelabs.org** with a courtesy copy addressed to natalie@northridgelabs.org,

requesting a 27' Boston Whaler Challenger boat NOAA had reported to GSA as excess property.

Attached to this email was a letter dated October 21, 2013, and signed by Budic. The letter

included the following statements:

> "Pursuant to 15 USC 3710(i) Utilization of Federal Technology we hereby request that
> decommissioned and surplus Boston Whaler Challenger 27 "SHORT RAKER I" which is
> at the National Oceanic Atmospheric Administration NMFS Washington be permanently
> transfer[sic] from NOAA to the Northridge National Laboratory (a 501(c)3 nonprofit
> science, technology and education corporation, as required by 15 USC 3710(i)). CAGE
> Code: 6VY63."

> "Upon acceptance of the official transfer of custody, NNL intends to use this equipment
> for the purpose of supporting technology research and development projects pertinent to
> national security."

21. Over the course of the investigation, special agents have collected at least 12

additional letters, dated between December 17, 2013, and August 1, 2014, similar to the letter

described in the preceding paragraph. The majority of these letters were attached to an email

sent from **patrick@northridgelabs.org** to a U.S. Government agency requesting government

assets declared as excess property be transferred to NNL. Each of these letters was signed by

Budic and included the statement describing NNL as a 501(c)(3) nonprofit science, technology,

and education corporation. Each of the letters also included the statement that NNL intended to

use the items requested in projects pertinent to national security or pertinent to national security

and defense. These letters were addressed to offices from the U.S. Department of Veterans

Affairs, U.S. Department of Interior, U.S. Department of Homeland Security, U.S. Department

of Agriculture, U.S. Department of Energy, and U.S. Department of State.

22. I have reviewed Internal Revenue Service records related to NNL that have been

collected by a special agent assigned to this investigation. The records reveal that NNL was not

granted exemption from Federal income tax under section 501(c)(3) of the Internal Revenue

Code until August 15, 2014. I have also reviewed NNL's Application for Recognition of

Exemption Under Section 501(c)(3) of the Internal Revenue Code. Markings on this document

indicated that it was postmarked November 4, 2013, and received on November 6, 2013. The

application was signed by David Rousseau, under the title of Director, on May 21, 2013. Part VIII of the application, question number 5, asked, "Are you affiliated with a government unit? If "Yes," explain." The response to this question was marked "No."

Budic Statements Related to NNL Affiliation with Various Government Agencies

23.    On February 21, 2014, a GSA OIG special agent undercover as a GSA property disposal specialist made a recorded telephone call to Patrick Budic, at telephone (414) 456-9300, from Auburn, Washington. The undercover agent called under the guise of inquiring about Budic's request for excess iComm radios from Customs and Border Protection, U.S. Department of Homeland Security. During the call, Budic made several statements claiming a connection between NNL and the U.S. Government. Specifically, Budic claimed that he and NNL were working with Defense Security Service ("DSS"), top GSA attorneys, and the U.S. Attorney's Office. He further claimed that NNL falls under the authority of 15 U.S.C. 3710(i) because it was a nonprofit and that NNL did research and development, exclusively defense related, "DOE"[2], and a bunch of other things. Additionally, Budic indicated that attorneys at the top of GSA and the U.S. Attorney's Office advised him and NNL on movement of property outside of a LP CRADA or CRADA.[3] After refusing to provide the location of the lab, Budic indicated that anyone needing to know this can jump on SAMS [a database previously described in Paragraph 9 and in which NNL had an active profile] from a federal computer.

24.    On September 16, 2014, a GSA OIG special agent undercover as a GSA property disposal specialist made a recorded telephone call to Patrick Budic, at (414) 456-9300, from Auburn, Washington. The undercover agent called in response to an email a GSA supervisory disposal specialist in Auburn, Washington, received on the same date from **patrick@northridgelabs.org**, with a courtesy copy addressed to natalie@northridgelabs.org.

---

[2] Affiant reasonably believes Budic's reference to "DOE" is the Department of Energy.
[3] Though not defined by Budic, your affiant knows the definition of these acronyms from experience gained during this investigation. A Cooperative Research and Development Agreement (CRADA) is a legal agreement between a government research and development (R&D) laboratory and a Non-Navy Partner(s) to cooperatively conduct R&D in a given technical area and share in the technical results derived from the joint effort. Limited Purpose CRADAs (LP-CRADAs) are restricted to the exchange of existing equipment or material that collaborators need for their own research, test, evaluation, development or engineering activities. There is no joint work performed under the LP-CRADA, but there is a mutual interest in the research outcome.

11

Within the email, Budic inquired into NNL's request that excess aircraft be transferred from the Department of Defense ("DoD") to NNL. At the end of the email, Budic stated, "At this time I have no control what actions the other Directors will take in this matter. They currently work strictly with the DoD. However, I would like to think there is a failure in communications that can be brought back on track. My aid has brought my phone and a laptop to the house and will be able to help back channel. Please contact me by phone ASAP so we can clear this up before there is a significant escalation in the matter." During the call, Budic made several statements claiming a connection between NNL and the U.S. Government, these statements include as follows [all paraphrased and only portions of the overall conversation, which totaled approximately 53 minutes in duration, to give additional context, the approximate timestamp of the portion of the conversation has been added]:

   a. (14:50) The undercover agent asked Budic if NNL was currently doing work with the Department of Defense. Budic responded, "In general, yeah. We're, we're, we're, we're a, uh, non-government research activity. So we do, yes, most of the work we do here is defense related. Also, FEMA, uh, we do uh, mass evacuation, mass cas[ualty]. Research; we do a bunch of things."

   b. (15:14) The undercover agent asked Budic, "Working with the Department of Defense?" To which Budic replied, "Correct." The undercover agent asked if NNL was contracted by the Department of Defense, if it was a grant issued by the Department of Defense; what was the mechanism? Budic replied, "Oh, I can't, I can't go into that. First, I'm on meds, so there's no way I can discuss, they won't even come close to that. And secondly, I'd need stuff like that in writing."

   c. (15:50) The undercover agent told Budic he would put it in writing, but would still need to know, Budic replied, "No, see, here's where you are overstepping. 3710, we request the excess equipment. They say yes. The equipment transfers as a normal, uh, equipment transfer. And that's the end of it. It's very short, sweet, simple. It's not long, drawn out, uh, you know, the Colonel had said, said yesterday afternoon that, 'Why is something that should take him, more or less an hour to do, taking weeks?'" The undercover agent asked, "Colonel?" Budic responded, "Yeah, the other side where its DoD. My counterpart that is working

for me is all military. All those guys are on the other side of the country, and they work with the optics and they work with a bunch of other things."

d. (29:30) When asked where the aircraft were going, Budic responded that due to operational security, it would not be divulged. Budic stated, "If you guys absolutely must know that, and be, just, advised you're gonna, you'll get probably more than what you're bargaining for. You can send a request, and you can ask for what you think you might want to know. I will push that over to the people, uh, the folks that dictate that type of thing. And, you'll get the response that they're going to give you. I don't know whether it will be, uh, check with airfield X, or whether it will going to be a whole mess of people who come and visit you from DCSS or DSS."

e. (30:35) The undercover agent asked Budic, "From DSS, the Defense Security Service?" Budic replied, "Yes. I have no idea how that going to... Last time that uh, someone that, uh, some folks decided they were going to play some games, they got a pretty, uh, rude reply." The undercover agent further asked, "(laughing) Oh really?" Budic replied, "Um well actually, it was more the FBI was pissed off because they were wasting, they were getting their time wasted. So, you know, and we were told to, you know, I said, Hey, let's go talk, lets go, uh, down to your place, I'll meet you down there and we'll talk, I'll bring credentials and we'll chat with your director. And, no, no, no, no, I just want to see your, your SCIFs. And, I'm like, okay, well, you know, if you are who you say you are, because I couldn't even tell who, you know, a phone number, big deal. Uh, I said, no that's, that's great, but what you're asking for is access to, you know, military data and stuff, because that's basically what the SCIFs are used for, or would be used for. And, well, okay, so why don't we meet down at your director's office and we'll talk about it. But other than that, our DSS agent, uh, and I gave the name, and he's like, well that's counter-intelligence. I'm like, yep. (Budic laughs) And I said I will happily come down and chat with you. Other than that, it's, it ain't gonna happen dude."

f. (31:45) The undercover agent asked, "Are you guys working with DSS, you mentioned a DSS agent?" Budic replied, "We've been around for over a year and

a half. The scientists that work with us and for us, have been around for...
(laughs) I think the oldest guy is probably twenty, thirty-some years doing what
he does, but...." The undercover agent further asked, "Okay, are you guys, are
you guys working with DSS now though, the Defense Security Service?" Budic
replied, "Yeah, to a point, yeah. Again, I'm not going to discuss most of this, this
stuff because you have no need to know. You're the GSA."

g. (32:22) The undercover agent inquired, "You mentioned a DSS agent." Budic
replied, "Yeah." The undercover agent asked, "I mean, so is there a particular
agent that you are working with?" Budic replied, "No, absolutely, I would never
give up names. I will let them know. But that's not in your benefit, I'll tell you
that right away."

h. (32:40) The undercover agent stated, "If you would like to, have the DSS agent
contact me directly, I, I would appreciate that, that would actually, that would
actually probably be pretty helpful." Budic replied, "That is, that is not, I'm
telling you now, I mean, I'll, I'll let everybody else that is doing my work for me
right now, you know, know, but I'm telling you right now it is not, you're not
going to get the result you think you're going to get." The undercover agent
asked, "Why?" Budic replied, "Because, well, for starters, GSA, we can't work
with you, you can't work with us. That is, that has been told by the GSA
attorneys, that has been told by the US Attorneys. Uh, that has pretty much been
enforced by Congress. You know, you guys, I don't see a problem with you
helping out the other agency as far as uh, you know, how do we fill stuff out. But
as far as any form of vetting, any form of anything else, that these other folks
have already done; there's no need to know. I mean, I'm on drugs and I can tell
you right now that there is no need for you guys to know, period. You know, you
handle the paperwork, you don't do vetting."

i. (33:50) – The undercover agent again offers to take the matter up with the DSS
agent Budic has referred to. Budic replied, "Send the request. I'm going to put, I,
I, I send it over to the guys that are covering for me right now." The undercover
agent responded, "Okay." Budic added, "But uh, I don't think you're going to get
the response or the reply that you think you're going to get."

j. (46:15) – The undercover agent told Budic he had no problem discussing this with the DSS agent Budic mentioned earlier and to pass along his contact information to the DSS agent and have the DSS agent give him a call. Budic replied, "You're missing the bigger picture that happens a little higher up than probably you are. Is when that's triggered, there's other stuff that, that, so, person X. Say, say a car goes by the facility a little more than it should and you run the plates and its somebody else. Just because that uh, those folks ran the plate and it turns out to be someone else that doesn't really have a reason, but also triggers other people to go investigate and it could have been someone that has, uh, a girlfriend or it could have been something elsewhere, but everything has its checks and balances. So if we say, you know, okay well here's a guy from GSA. Or, you know, like last year, same thing, here's a guy from GSA, uh, they want to know facilities, they want to know names of personnel, they want to know locations. These are all red flags, uh, because there is no, there is no need for anybody to know names of other than your point of contact. And, what that does, is that triggers the DSS people, that triggers, uh, folks inside the DoD internal security, uh, that moves people over to other, uh, things that they are doing that forces a lot of changes. Because, that's just how that works. So, whether it's, every, everything is, is, treated as, as uh, as a threat, until they can discern it otherwise." The undercover agent responded, "Well, I don't want to get myself in trouble. I mean what are you saying? I mean, I'm not, I, I shouldn't ask?" Budic replied, "If you're going to ask, make sure you're asking for the right reason. If you really absolutely need to talk to that person because you need authorization from that person, which you don't, but if you feel you do, then say I need to talk, because of this and why, so that either they are the person that's going to, which I'm going to tell you DSS is not. Uh, but if you need to have someone than either someone else will call you and say, yes this is what you need to know and here is the information. So, don't back yourself into a corner."

25.     On March 8, 2016, the special agents interviewing Budic brought up the conversation Budic had with a GSA property disposal specialist (actually an undercover agent), described in the previous paragraph of this affidavit. The interviewing agent reminded Budic

that he had talked to this GSA employee on February 21, 2014, about some iComm radios that Budic was asking for on behalf of NNL. Budic affirmed. The interviewing agent then went on to describe how, in that conversation, Budic said (1) NNL had to bring Defense Security in, due to questions about the facility and other questions; and (2) that when Budic was asked what agency Defense Security was, he said it was DSS, counter-intelligence. The interviewing agent told Budic how Budic went on and on talking about how DSS was flagging government employees, asking questions about the lab, that they (referring to DSS) were counter-intelligence, that they were working on an investigation, that Budic was working with the U.S. Attorney's Office and the Defense Security Service. The interviewing agent told Budic that these were all statements Budic had made to the GSA employee. Budic told the interviewing agent that he didn't remember saying that. The interviewing agent then asked Budic, "What affiliation do you have with the Defense Security Service?" Budic replied, "I don't recall most of this. When I talked with – we have no affiliation, and you know it. The – when I talked to him, he called me after surgeries, and I know…" The interviewing agent reminded Budic that this conversation had occurred before a separate conversation Budic had with the same GSA employee when Budic had claimed to have just gotten out of surgery. The interview continued, and Budic again stated NNL was not affiliated with the Defense Security Service. Budic stated, "No, we're not affiliated." The interviewing agent said, "I know you're not." Budic then stated, "I wouldn't say – no, I wouldn't say we're affiliated. As a matter of fact, when people ask when you work with, with – are you working with, are you working for, are working this, I've always said, 'I work with groups, never for.' There's a difference."

26. On December 14, 2014, the Director of the GSA Personal Property Policy Division received an email from **patrick@northridgelabs.org**. Attached to the email was a document with NNL letterhead, marked, "For Official Use Only," and dated November 6, 2014. The document was addressed to the GSA Personal Property Policy Division Director, with the subject of, "15 U.S. CODE §3710(i) transfers audit partial overview." The document directed the reader to learn more about NNL at the NNL website at www.northridgelabs.org, after which included the statement, "DSS Scrubbed." The document included an allegation that GSA personnel had cost NNL an estimated $760 Million in the form of $757,981,506 in total value of denied equipment. The document alleged that GSA personnel had deliberately and persistently

16

worked to block NNL excess property acquisitions. The document also stated that NNL had successfully acquired the following excess property:

    a.   One boat valued at $18,000;

    b.   47 other/miscellaneous items valued at $11,298,000, including a $10 Million supercomputer and a $250,000 automated pharmaceuticals dispenser.

27.    On November 18, 2015, a GSA OIG special agent made a recorded telephone call to Patrick Budic, from Auburn, Washington. During the call, the agent identified himself as a special agent with GSA OIG and asked for information related to NNL. During the conversation, the agent asked Budic about a statement Budic had made in correspondence forwarded to GSA OIG, where Budic stated the NNL website was, "DSS scrubbed." Budic replied that Defense Security went through it a couple of years ago and said what information they could and could not have on it.

28.    In September 2014, a special agent assigned to this investigation contacted the Defense Security Service, Office of Inspector General. The special agent learned that they were unable to locate any records for NNL in the Industrial Security Facilities Database. The Industrial Security Facilities Database is the system of records used for facility security clearances granted by Department of Defense and 24 other federal agencies that are under the security cognizance of Defense Security Service. If a facility clearance had ever been granted, the record would be in the Industrial Security Facilities Database. Additionally, the special agent learned that Defense Security Service would not sanitize a company's website if that company had classified contracts.

29.    A special agent assigned to this investigation obtained records from GSA related to NNL's profile within SAM (previously described in Paragraph 9). SAM is a database and website maintained by GSA at https://www.sam.gov. Entities who want to do business with the U.S. Government register within SAM, creating an Entity Record, which includes representations and certifications about the entity to the U.S. Government. Government contracting and grants officials, as well as other government officials, review the entity's information included in SAM when considering conducting business with the entity. According to GSA records, the SAM Entity Record for NNL was created on April 24, 2013, by user Patrick Budic. Within the Entity Record, Patrick Budic was listed as the Director of NNL. He was the only individual listed under the NNL Points of Contact portion of the Entity Record and the

following email addresses were listed: arpoc@northridgelabs.org, govtpoc@northridgelabs.org, and samgovpoc@northridgelabs.org. The Entity Record includes a section to list the entity's security level, as well as the entity's highest employee security level. This section is self-selected by the user registering the entity and it is incumbent upon the registrant to understand the terms and use them appropriately. Before the registration process is complete, the user/registrant agrees to the following terms: "You can not submit your record until you have certified that the information is accurate and complete. Knowingly providing false or misleading information may result in criminal or civil penalties as per Title 18, Section 1001 of the U.S. Criminal Code." For NNL, both of these sections were marked, "Government Top Secret." The SAM user guide (version date June 24, 2016), publicly available at the SAM website, provides the following instruction as to filling out the security level section:

    a. Company Security Level - If your company facility has been awarded a facility security clearance by the government, choose the correct level of security for the facility. Please refer to http://www.dss.mil/isp/fac_clear/per_sec_clear_proc_faqs.html for more information on facility security clearances.

    b. Highest Employee Security Level - If the employees at your company have been awarded security clearances (for example, Secret, Top Secret), choose the security level of the employee with the highest employee security level at that facility.

30.    On November 30, 2015, a DCIS special agent contacted DSS in Milwaukee, Wisconsin. DSS told this special agent that they knew of Budic, but that Budic did not have any classified contracts, and may have rented a space in a vacated shopping mall in Milwaukee. DSS also said that at one time Budic talked his way into getting an office space at the U.S. Army Reserve Center in Milwaukee, across the hall from the DSS agent that was located there. Budic was later removed. They had not found anything indicating Budic legitimately held classified U.S. Government contracts.

31.    Special agents asked Budic about NNL's security level entries in its SAM Entity Record when they interviewed Budic on March 8, 2016. Budic provided an explanation that the SAM dropdown selections would default to a security level based upon the employee's highest security level. Budic denied that this portion of the SAM system was a self-certification portion and said that a DSS agent had told him it did not matter without a DSS certification. Budic

admitted that he did not have a security clearance, but said that NNL had several people with a "TS" clearance. Budic was asked if NNL had employees with a top secret clearance. Budic responded that, "The people that work with us that have a TS." When the agents continued to question Budic on the subject, he responded, "We have people at the lab that have TS. The rest, I couldn't tell you." Budic told the agents the inputs in SAM were based on what they had asked DSS, what they had asked the help desk, and what the Navy had said as well. The agents confronted Budic with their knowledge that while the DSS in Milwaukee knew of Budic, DSS did not know of NNL having any kind of security clearance, and that DSS's database did not show NNL as a cleared facility. Budic agreed and recounted a conversation he had with a DSS agent in Milwaukee, when the agent told Budic he looked it up, Budic said they looked it up by the, "cages" (based on my training and experience, I recognize CAGE as an acronym commonly used by the Department of Defense to identify vendors), and the DSS agent told Budic, "Well, you're not in the database. You're not cleared." Budic told the interviewing agents that his response to the DSS agent was, "Well, no, we don't even have the buildings." Budic then referred to selecting the dropdown selections based on the highest person's security rating. Budic was asked about the research NNL was conducting. Budic stated NNL was conducting research in a couple of different states, that he did not have a security clearance to work on his stuff, and that he was doing the primary research for all of the stuff they were talking about. Ultimately, Budic admitted that David Rousseau was the NNL employee with the government top secret clearance, but earlier Budic stated no employee was conducting NNL research at the TS level. Budic also admitted that he was the one that input the information into SAM for NNL's Entity Record.

32.     As stated previously in this affidavit, in the NNL application to the IRS for tax exempt status, NNL stated it was not affiliated with a government unit.

**Budic Excess Property Acquisitions on Behalf of NNL**

Budic's Use of a Department of Defense Activity Address Code

33.     Between September 25, 2014, and October 6, 2014, Budic used a U.S. Army Medical Research Acquisition Activity, Fort Detrick, MD, Department of Defense Activity Address Code (hereinafter referred to as "DoDAAC") to gain access to the Defense Contract Management Agency's (hereinafter referred to as "DCMA") Plant Clearance Automated

Reutilization Screening System (hereinafter referred to as "PCARSS"). A DoDAAC is a six-position code that uniquely identifies a unit, activity, or organization that has the authority to requisition, contract for, receive, have custody of, issue, or ship government-owned assets, or fund/pay bills for materials and/or services. The first positions of the code designate the particular service/agency element of ownership. These codes are particularly important for the U.S. Government financial, contracting, and auditing records. PCARSS is a system operated by the DCMA. PCARSS allows acquiring agencies to view excess property, create requisitions, and see the status of current requisitions. Budic was initially granted access to PCARSS as a screener which allowed him to view property that was available before it went to the GSA. He could also requisition items through PCARSS. Budic presented himself to DCMA as a "National Laboratory" and used the Stevenson-Wydler Act, 15 USC Section 3710(i) as his mechanism to have access to PCARSS. The DCMA approving official recalled that Budic might have mentioned he had contracts with the U.S. Army Medical Research Acquisition Activity and allowed him access to PCARSS using DoDAAC: W81XWH. Budic did not obtain government property using the PCARSS system but he did obtain government property that was in the custody of DoD contractors by telling DCMA that NNL is an educational 501(c)(3) non-profit organization, and referenced the Computers for Learning program executive order in the NNL letter requesting the property. He obtained approximately 96 items of Government property such as computer hardware, monitors, printers, routers, laptops, docking stations, servers and projectors. On October 6, 2014, DCIS informed DCMA of this investigation and Budic's access to PCARSS was terminated.

34. On December 1, 2015, a DCIS special agent contacted a DCMA Security Program Manager, Information and Operations, and requested assistance. The investigative team wanted to find out if Budic used DoDAAC - W81XWH at any other time to register in PCARSS. Agents learned that Budic used DoDAAC - W81XWH to register for PCARSS access on July 24, 2015, but his login was deleted and his account expired on July 29, 2015.

35. In March 2016, a DCIS special agent contacted the Chief of the Business Operations Division, U.S. Army Medical Research Acquisition Activity, Fort Detrick, MD. The special agent learned that the U.S. Army Medical Research Acquisition Activity had never provided approval for Budic, NNL, or PMR Research and Development, to use their unit's DoDAAC - W81XWH. The Chief could not locate any records to indicate her organization had

any contact with either Budic or his organizations. The Chief added that it was also unlikely that this unit would give permission to any entity/person to use its DoDAAC to obtain property through DCMA.

36.     On March 9, 2016, special agents from DCIS and NCIS interviewed David Rousseau at his place of employment, the U.S. Navy Space and Naval Warfare Systems Center Pacific (hereinafter referred to as "SPAWAR") in San Diego, CA. The interview was non-custodial. As Rousseau is a civilian employee of the U.S. Navy, he was provided with a "Garrity" advisement by the interviewing agents. Rousseau consented to the interview and the recording of the interview. The interviewing agents asked Rousseau where Budic obtained a DoDAAC to gain access to the DoD's system, PCARSS. Rousseau stated a man named "Don Shaw" who worked on an Army contract gave Budic his DoDAAC but told him he could look at stuff with it but not actually use it to acquire items. Don Shaw worked as an aircraft developer in Los Angeles, CA. Rousseau followed up with an e-mail that reflected Don Shaw of "Advanced Tactics, Inc." has a contract with the Army Medical Command for developing new vertical takeoff and landing aircraft technology. Rousseau further stated that NNL offered to help Shaw with his technology development and offered to look for excess government equipment that would be useful for his research. Shaw provided the DoDAAC so that Budic could look through the excess inventories at DCMA and DLA. Budic made it absolutely clear to Shaw that the DoDAAC was never going to be used to actually acquire anything, just to see what was available. Rousseau provided examples of excess aircraft and an excess truck he believed Budic found using the DoDAAC. Rousseau provided examples of how these items could be used to support Shaw's research; the aircraft for development of the technology, and a cargo truck for transportation of equipment for testing purposes.

37.     As previously disclosed in this affidavit, Special agents from GSA OIG and DCIS interviewed Budic on March 8, 2016. The interviewing agents asked Budic about his use of Fort Detrick, MD, DoDAAC. When asked about the DoDAAC generally, Budic stated he would have to look it up. Then, when asked if the USA Medical Research Acquisition Action would have given permission for NNL to use the DoDAAC, Budic replied, "We were assisting someone… That was working with – on a contract." The interviewing agents stated Budic had used the DoDAAC for access to PCARSS, to which Budic responded that it was for PCARSS. Budic then made statements alluding to the help desk telling Budic to use the DoDAAC. Budic

21

said he had email supporting this. When the interviewing agents said they would need to see these emails because the agents had contacted the agency of the DoDAAC and nobody said that NNL/Budic had permission to use the DoDAAC. Budic responded, "... -- we didn't use it to acquire jack crap." The interviewing agents confronted Budic with their knowledge that Budic used the DoDAAC to gain access to a government database he otherwise would have been unable to access. Budic responded that it was what they were told when working with the IT people. The interview agents clarified, asking if the help desk told Budic to use the DoDAAC. Budic responded, "They were shoving, they were shoving all sorts of stuff in there to try and figure out if they could get us to be able to screen. The screening was under 3710, which is part of the FAR, and actually, it's probably in any one of those letters that shows at the bottom that it's actually from the DCMA." Budic then told the interviewing agents that NNL was never able to successfully screen and obtain excess equipment from DCMA through PCARSS. They could never get the screening to work. He stated, "The equipment that was from DCMA was actually through screening off of the GSA side of stuff."

Budic Acquisition of Equipment from a DOD Chemical Agent Disposal Facility

38.    DCIS contacted the Plant Clearance Officer (PCO), Umatilla Chemical Agent Disposal Facility. This PCO was contacted because she was listed as the PCO related to numerous pieces of property acquired by Patrick Budic/ NNL. The PCO provided copies of three Shipping Orders, dated February 4, 2014, March 18, 2014, and May 14, 2014. The shipping labels indicated the property was shipped to: Patrick Budic, (414) 456-9300, Northridge National Laboratory, 7440 W Greenfield Ave Unit 44101, West Allis, WI 53214-6134, **patrick@northridgelabs.org**. The three shipping order documents contain columns for unit cost and total cost. Total cost associated with the three shipping orders is $71,925.10. Budic obtained office supplies, computers and computer related equipment, handheld radios, radio chargers, and lab coats from the Chemical Agent Disposal Facility.

39.    Included within the Umatilla PCO's files was a letter on NNL letterhead dated February 20, 2014, and signed by Budic. The letter, addressed to the Umatilla PCO, requested the excess items, "...be permanently transferred from the Defense Contract Management Agency to Northridge National Laboratory (a 501(c)3 nonprofit science, technology and education corporation, CAGE code: 6VY63) as required by 15 USC 3710(i)." The letter also

stated that NNL intended to use the equipment for the purpose of supporting technology research and development projects pertinent to national security. The point of contact at the bottom of the letter was Budic, at (414) 456-9300 and **patrick@northridgelabs.org**.

40.     Copies of United Parcel Service shipping labels included within the Umatilla PCO's files memorialized two shipments from the Umatilla PCO's facility in Stockton, UT, to Budic/NNL at 7440 W Greenfield Ave, Unit 44101, West Allis, WI. The labels were both dated May 19, 2014, and stated that the first shipment weighed 34 pounds, while the second shipment weighed 47 pounds. A review of the three shipping orders processed by the Umatilla PCO's facility revealed that the items were shipped out on three dates; the first was February 14, 2014, via UPS; the second was via UPS on March 25, 2014; and the third and final was via UPS on May 21, 2014.

## Budic Attempted Acquisition of Department of Defense Aircraft

41.     On November 12, 2013, Budic sent an e-mail with two attachments, a correspondence type of memo to the U.S. Air Force Property Administrator at the Pentagon, Washington D.C., and an attachment named Northridge National Laboratory Executive Summary, August 2013. The Principal Point of Contact was Patrick Budic, Acting Director, and the address was 7440 W. Greenfield Ave. Unit 44101, West Allis, WI 53214, e-mail **patrick@northridgelabs.org**. Budic claimed he provided several unnamed members of Congress an edited version of this report. The executive summary claimed that NNL will provide office facilities, a Secured Classified Information Facility (SCIF) consisting of a 500 seat briefing and conference theater, a 200 seat briefing and conference theater, two 50 seat briefing and conference rooms, and secure (isolated) computing facilities. The report also claimed this SCIF will be unmatched by any other facility or institution in the country and will be in great demand by government and industry. The correspondence attachment on Northridge National Laboratory letterhead (dated November 12, 2013) was for Ruth Cole, Property Administrator, USAF, 1070 Air Force, Pentagon, Washington D.C. 20330. The subject of the correspondence was for the transfer of custody of 14 Bombardier Aerospace LearJet C-21A's. Budic requested that these aircraft be permanently transferred from the United States Air Force to NNL. Upon acceptance of the official transfer of custody, NNL intended to use this equipment for the purpose of supporting technology research and development projects pertinent to national

security. DCIS contacted the USAF Inactive Fleet Manager, the Aerospace Vehicle Distribution Officer at the 309th Aerospace Maintenance and Regeneration Center, Davis-Monthan Air Force Base, AZ, the U.S. Army System Synchronism Officer for all fixed wing aircraft, and the U.S. Navy Stricken Aircraft Program Manager and determined that Patrick Budic has not acquired any aircraft from the DoD.

Budic Acquisition of U.S. Department of Interior Equipment

42.     In a letter dated December 17, 2013, addressed to a U.S. Geological Survey, Department of Interior (hereinafter referred to as "USGS") office located in Ithaca, New York, Budic requested a seismograph be transferred to NNL. The letter included the following statements:

> "Pursuant to 15 USC 3710(i) Utilization of Federal Technology we hereby request that the excess Geometrics SE24 Seismograph (Item Control Number: 1433AX33230002) and all other associated equipment and materiel, which is located at USGS, Water Science Center - Ithaca be permanently transferred from the USGS to the Northridge National Laboratory (a 501(c)3 nonprofit science, technology and education corporation, CAGE Code: 6VY63) as required by 15 USC 3710(i)."

> "Upon acceptance of the official transfer of custody, NNL intends to use this equipment for the purpose of supporting technology research and development projects pertinent to national security."

The seismograph was originally listed in the GSAXcess system as excess property and the GSAXcess listing stated the seismograph originally cost the USGS $17,098.01 and had a fair market value of $6,170.86. I have reviewed email correspondence between the USGS and Budic, from **patrick@northridgelabs.org**, related to this transfer, dated in December 2013 and January 2014. One of these emails was sent from Budic to a USGS property officer located in Reston, Virginia. Within the email, Budic thanked the property officer for assistance in transferring the seismograph to NNL earlier in the month. Pursuant to Budic's request to USGS, GSA withdrew the seismograph listing in GSAXcess on December 17, 2013. Pursuant to Budic's request, the seismograph was ultimately shipped to Budic/NNL via United Parcel Service, shipment tracking number: 1ZE173960394795836. USGS shipped the seismograph from the USGS Water Science Center located at 30 Brown Road, Ithaca, New York, to

24

Budic/NNL at 7440 W Greenfield Avenue, Unit 44101, West Allis, Wisconsin. I have reviewed a United Parcel Service proof of delivery provided by the USGS that stated shipment 1ZE173960394795836 was delivered on January 21, 2014.

43.    On March 8, 2016, Budic was interviewed by special agents from GSA OIG and DCIS. The interviewing agents asked Budic about the seismograph NNL obtained from USGS. Budic stated the seismograph was still being worked on to be fixed and that, "It's been missing streamers, and it was missing some other stuff." Budic stated NNL still had the seismograph and that NNL did not just dump stuff.

Budic Acquisition of U.S. Department of Veterans Affairs Equipment

44.    A GSA Standard Form 122 dated February 4, 2014, memorialized the transfer of two Scriptpro brand automated prescription dispensing machines from the U.S. Department of Veterans Affairs (hereinafter referred to as "VA") to NNL. According to the GSA form, the first item was a Scriptpro, Model – SPUD, Serial Number UM0010201, that originally cost the U.S. Government $249,063 and was located at a VA facility in Columbus, GA. The second item was a Scriptpro, Model – SP100, Serial Number 3003-1000-12, that originally cost the U.S. Government $278,758 and was located at a VA facility in Fort Rucker, AL. The GSA form was signed on July 16, 2014, indicating NNL's receipt of the items. In an internal email between VA property officers dated February 3, 2014, this equipment was described as two pharmacy Scriptpro SP-100s and SPUD with telepharmacy equipment.

45.    A special agent with VA OIG assigned to this investigation collected email correspondence between the VA and Budic related to the Scriptpro machines. In an email dated February 3, 2014, sent from **patrick@northridgelabs.org**, to a VA property officer, Budic stated the two excess "Sp-100's" would be used in conjunction with the Mass Medical Evacuation and Disaster Response activities at NNL, as well as regional "SAR" and "EMS" support (the acronyms were not further defined in the email). The email further stated NNL would be using 15 U.S.C. § 3710(i) as the transfer mechanism, which the email stated was the same format NNL used with the U.S. District Courts, National Science Foundation, USGS, FAA, and DOD for acquiring equipment. Attached to the email was a letter with NNL letterhead, dated February 3, 2014, requesting that the two Scriptpro units be permanently transferred from VA to NNL, a 501(c)(3) nonprofit, science, technology and education corporation. The letter

further stated that NNL intended to use the equipment for the purpose of supporting technology research and development projects pertinent to national security. The letter was signed by Budic, dated February 3, 2014.

46.     As previously stated in this affidavit, NNL's tax exempt status determination letter from the IRS was dated August, 15, 2014. This letter notified NNL that upon the IRS's review of NNL's application for tax exempt status, the IRS determined NNL was exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code.

47.     Budic emailed the VA multiple times between February 2, 2014, and July 16, 2014, regarding the transfer and ultimately, the retrieval of the Scriptpros from VA. Each of the emails to or from Budic was under the account **patrick@northridgelabs.org**. However, on March 10, 2014, Budic sent an email to a VA property officer asking about the operating hours of the VA facilities the Scriptpros were located at. Within the email, Budic further stated he may be able to send a team out during this week. This email was sent from account **patrick@pmrmarine.com**. On this same date, the VA property officer sent a reply email to **patrick@pmrmarine.com** with the operating hours of each facility. On March 12, 2014, Budic sent a reply from **patrick@northridgelabs.org** to the VA property officer stating they would be leaving Milwaukee on March 19 and should start gathering the equipment on March 20. Budic asked who the points of contact were at each facility. Another email from Budic, dated March 19, 2014, sent from **patrick@northridgelabs.org**, stated tha,t due to problems with an Enterprise rental truck, the pickup of the equipment would have to be rescheduled.

48.     As stated previously in this affidavit, PMR Research and Development was a previous enterprise operated by Budic, and within the GSA System for Award Management profile for PMR, **patrick@pmrmarine.com** was listed as one of the point of contact email addresses within the profile.

49.     In June 2016, a special agent from VA OIG assigned to this investigation interviewed the VA Lead Inventory Management Specialist, assigned to a VA facility in Montgomery, AL, who coordinated with Budic regarding NNL's request for the Scriptpro machines. According to this witness, Budic told him that NNL was a "national laboratory" that worked with the Federal Emergency Management Agency and that Budic could "freeze" equipment listed on GSAXcess, which the VA could donate to NNL under the Stevenson-Wydler Act. The witness acknowledged receipt of the February 3, 2014, email described above

26

in which Budic originally requested the Scriptpro machines on behalf of NNL. According to the witness, both Scriptpros were ultimately retrieved from the VA facilities. On July 16, 2014, Budic emailed the witness a signed copy of the SF122, indicating a received date of July 16, 2014. The special agent from VA OIG obtained a copy of this last email, and it was sent from account **patrick@northridgelabs.org**.

50. On March 8, 2016, Budic was interviewed by special agents from GSA OIG and DCIS. The interviewing agents asked Budic about the two Scriptpro units NNL obtained from the VA. Budic affirmed that NNL had obtained the Scriptpro units to work with, "…medical mass evacuation, mass cas[ualty] design and whether or not you could outfit a vehicle and use those from site to site, taking those with the medi mets and the medical mass evacuation set ups is, are they operable in there." Budic then went on to say the units did not work out as intended and were useless. When asked what happened to the units, Budic stated, "Um, they're still sitting in a warehouse someplace trying to get disposed of. They're junk. They probably cost us maybe $15,000 for that whole mess, and they didn't want anything to do with it. We even tried to give it back, which was even more amusing, because no one wanted them." Budic did not provide the interviewing agents with a location of the Scriptpro units; he only alluded to the units being, "…uh, out east, I think."

51. A special agent from GSA OIG reviewed records obtained from eBay pursuant to a subpoena on or about November 8, 2016. According to these records a medical equipment reseller named MST & Associates, Inc. (further described in the following paragraphs within this affidavit), listed a ScriptPro SP 100 automated prescription unit for sale at a price of $80,000. The listing was created on May 4, 2015.

### NNL Sales of Equipment Obtained from the Government

52. In March 2016, a former employee of MST & Associates, Inc. (hereinafter referred to as "MST"), a medical equipment reseller located at 1315 Commerce Street, Petersburg, Virginia, provided information to GSA OIG alleging MST had partnered with Budic to sell medical equipment Budic acquired from the U.S. Government. This former employee told a special agent assigned to this investigation that Dan Knobel, owner of MST, told the former employee, on multiple occasions, about getting government surplus equipment from Patrick Budic of NNL.

27

53.     On one occasion, Knobel tasked the former employee to contact Budic. During this contact, Budic told the former employee that he was a government contractor and that he did covert stuff for the government, including research; Budic also told the former employee that he was well connected with the government. Budic told the former employee that the partnership between NNL and MST was helping him further his research. The former employee described this partnership as Budic acquiring equipment for free and then Knobel selling the equipment and giving Budic a cut of the proceeds. The former employee recounted conversations the former employee had with Knobel. Knobel told the former employee that Budic was a government contractor and Budic was using the money to further Budic's research. According to the former employee, Budic once told the former employee that the government never gave Budic enough money for the research he was doing for them, so he used the money he received from Knobel for his research. Knobel told the former employee that Budic had lawyers in DC that were giving testimony to Congress about rewriting the process to get equipment from the government. Knobel told the former employee that Budic had been acquiring surplus government property for MST for a couple of years. On one occasion, Knobel told the former employee that Knobel had loaned Budic $12,000.

54.     According to the former employee, the equipment Budic obtained was free, as opposed to MST buying used equipment from hospitals, so Knobel would take the free route whenever possible. The former employee did not know how much equipment MST received through Budic, but knew it to be a lot. Knobel had pointed out equipment to the former employee in the MST warehouse that Budic had helped MST obtain from the government. The former employee also recounted that Knobel once sent a truck somewhere in the Midwest to pick up equipment Budic had secured for MST.

55.     According to the former employee, Budic assisted MST in acquiring government equipment using two processes:

a.  Under the first process, Knobel would let Budic know of a request Knobel had received for a particular item. Budic would look for the item through his access to a GSA website that listed all types of equipment. This website was not for everyone and you needed a username and password to access it. If Budic located the item, he would request it using a SF30 or SF122 form. Budic would then let Knobel know. Knobel would then send his drivers to pick up the items. Then

28

Knobel would pay Budic; he paid in cash. Knobel kept a lot of cash on him. The former employee never saw Knobel pay Budic, but the former employee knew Knobel preferred cash transactions. The equipment was transferred to NNL, but picked up by MST.

b. The second process was identical to the first process, with one change. Eventually, Budic provided his access codes to the GSA portal to Knobel. Knobel and Mike Lowder, MST Operations Manager, would spend hours looking for equipment on the GSA website. Only Knobel, Lowder, and Jackie Knobel (Knobel's daughter) used the access codes to the GSA website provided by Budic. Knobel told the former employee that there was so much in there; he was going to have to hire someone full-time to review the site. Once they found an item, they would tell Budic and he would submit the forms to request the items. Then the remainder of the first process described would be followed.

56. In January 2017, a special agent assigned to this investigation conducted an additional interview of the former MST employee. From this interview, agents learned that Budic communicated with the former employee by email and by telephone while the former employee was employed by MST. The former employee believed Budic communicated by telephone more often than email, but remembered seeing email communications between Budic and Knobel, with Mike Lowder copied on some of these email communications. The former employee said the Knobel and Lowder email addresses Budic communicated with were their @mstmedical.com email addresses. During the interview, the former employee looked up contact information for Budic still retained by the former employee and disclosed the email address Budic had used as **patrick@northridgelabs.org**. The former employee recalled that this was the email address Budic had used in the email communications the former employee described during this interview. The former employee believed MST retained old email communications; the former employee recalled an email that Knobel once forwarded the former employee that was three or four years old at the time.

57. As previously stated in this affidavit, on March 9, 2016, David Rousseau was interviewed by special agents assigned to this investigation. During this interview, Rousseau stated the following related to Budic's acquisition of government property for NNL:

"Right. Yeah. So then, since one of the things that -- uh, see, part of the, the rationale for setting up Northridge the way we, we did is that, um, there's tons and tons of surplus government equipment --"

" -- that is, you know, going to scrap yards and stuff, and would it be possible to create a nation class or world class R&D facility just using all that stuff that the government is about to throw away, you know."

"Give that -- all that government equipment a second life and, you know, if you can get a, you know, a dark field microscope, or something like that, you know, why throw it in the trash heap, or send it to a scrapper, when you can use it, it's still a perfectly good piece of equipment, and, and do some research."

"So, what happens is he's been searching around through the, the listings of all the surplus equipment, looking for things that may be of use in the lab. Uh, one of the things he acquired I think from DCMA was a, a whole box of, uh, optical fiber connectors --"

"-- because one of the things we wanted to do at Northridge was put a fiber backbone through the whole thing, so that all the R&D little labs in there would be connected by internal fiber. Um, so that stuff was available and he said, 'Okay, I'll get that, and then you just hang onto it until you're ready to use it.'"

"Um, so, what happens a lot of the time is you see something listed on GSA, or, or, you know, DLA, or wherever and, you know, one case in point was, uh, external hard drives. It's like, 'Cool!'"

"You know, perfectly good external hard drives. You know, you can use those for storage and computers and all kind of stuff. You know, did the 3710(i), thing and sent away for them, and got the external hard drives. It turned out it was just the cases. Great. I got a bunch of useless hard drive cases."

"So, sell them, take the cash, you know, pay for gas for the, the truck or something, and try and get something else, you know. Send away for -- uh, see, because you really can't go and inspect this stuff all over the place --"

"-- uh, so you – and things come in like lots, you know."

"So, here's a lot of like six laptops, or something, you know. You say, 'Okay. Well, laptops. Yeah, let's get -- get some laptops,' you know."

"So, we'd send away from them and you'd get them. There's no power supplies, you know. The drives are missing on half of them, and three of them don't run, you know. What do you do with these things? They're paperweights, you know, so you --"

"-- you know, sell them for parts, or something and then use the money to try and keep going."

58. Also, during the March 9, 2016, interview, David Rousseau stated the following when asked about medical beds NNL had obtained from the Department of Veterans Affairs (hereinafter referred to as "VA"):

"Well, yeah. Yeah. So, as, as each of the limbs get pruned by GSA, as we try and get things from various agencies, um, you start, you know, grasping at straws."

"It's like, 'Well, okay. We can, you know, get some medical equipment from the VA, because it's up for, for grabs.' You know, it goes on the list. So, he says, 'Here's a 3710(i) request for, you know, whatever stock beds, for instance.' And in that case, um, some of them, if they were in good shape, would have been – we'd hang onto them, and use them in the, the, the clinic inside Northridge --"

"--you know, because you'd want a -- you know, ultimately in this big facility you'd like, you know, a gym, you know, a health kind of thing. You'd need, you know, somebody, in case their -- uh, you know, their little experiment they're working on, you know, blows up, or something silly, you know, and it's like, 'Oh, you know, so we take them down the hall to the, to the clinic, and that kind of stuff.' But, again, all this stuff goes in big lots, and you don't know what condition it's in and everything, 'So, okay. Yeah, we'll take, you know, 13 beds, or whatever they are.' And, you know, uh, he's been working with a company I think on the East Coast to pick those things up, and the stuff -- like I think he asked for some, some of those defibrillator things --'"" -- you know, those emergency defibrillator things, because you'd want some of those around the lab as well, and so they picked them up, and said, 'Well, three of them are junk and two of them are high time,' and all this other kind of stuff. So, well, okay. Go ahead and, you know, sell those off, you know, and keep your costs, you know, all that kind of stuff. With the rest of the money, we'll keep trying to keep going. So that's kind of how all that has, has spiraled out of control, basically."

59.     As previously stated in this affidavit, on March 8, 2016, Budic was interviewed by special agents from GSA OIG and DCIS. The interviewing agents asked Budic if NNL sold any of the equipment acquired from the government through the Stevenson-Wydler Act. Budic responded, "Some, some of the junk, we had to after a year." Budic added that NNL did not get what they needed and obtained items in parts and pieces. Budic stated NNL was stuck storing items obtained like this. The interviewing agents followed up, asking Budic what NNL did with the money when such items were sold. Budic responded that everything had to go back into the company, according to the U.S. Attorney's office. He added that there was to be no personal gains and the funds would go towards operation costs and bills of NNL. Budic stated he had business records to support this, but when asked where the records were, Budic stated he did not know. Budic stated he kept some records and other records were probably maintained out west.

60.     A special agent assigned to this investigation reviewed account records related to a bank account Budic held in his name at BMO Harris Bank, obtained pursuant to a subpoena. According to the records the account was an individual checking account opened by Budic in June 1999. The agent identified the following transactions marked as deposits within these records, which based on the description of the transaction, appeared to be from MST, each described as:

"EDI/EFT CTX CREDIT
CTX MST AND ASSOCIATE SENDER"

a.  March 4, 2015 - $8,800 deposit

b.  March 18, 2015 - $8,800 deposit

c.  June 12, 2015 - $12,000 deposit

d.  August 14, 2015 - $1,500 deposit

e.  August 27, 2015 - $5,725 deposit

f.  November 16, 2015 - $5,000 deposit

61.     As previously stated in this affidavit, a special agent from GSA OIG reviewed records obtained from eBay pursuant to a subpoena on or about November 8, 2016. The agent observed the following MST email addresses within these records:

a.  jacki.knobel@mstmedical.com

b.  mstequipsales@gmail.com

c.  adam.sorondo@mstmedical.com

d.  jacki.mst@gmail.com

e.  bobby.jones@mstmedical.com

f.  rachel.freeman@mstmedical.com

g.  sandy.wells@mstmedical.com

h.  dameon.hilliker@mstmedical.com

i.  alex.falkowski@mstmedical.com

**Probable Cause that Evidence will be Found on HostGator Servers**

62.     In my training and experience and the training and experience of the investigative team in this case, I have learned that HostGator provides online services, including electronic mail ("e-mail") access and a website to the public. Subscribers obtain an account by registering with HostGator. During the registration process, HostGator most likely asks subscribers to provide basic personal information. Therefore, the computers of HostGator are likely to contain stored electronic communications (including retrieved and unretrieved e-mail) and information concerning subscribers and their use of HostGator services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's users or users and verify transactions.

63.     In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account and a website. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

64.     In my training and experience, e-mail and website providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e. session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), methods used to connect to the

33

Case 2:17-mj-01256-WED   Filed 06/05/17   Page 34 of 41   Document 1

account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail and website providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account or website.

65.     In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

66.     On or about August 8, 2016, and September 29, 2016, pursuant to a subpoena, HostGator provided information related to the domains "pmrmarine.com" and "northridgelabs.org" to special agents assigned to this investigation. I have reviewed this information and observed the following:

    a.  "northridgelabs.org" was created on January 6, 2013, and expires on January 6, 2017. The same contact information was provided for registrant, admin, technical, and billing details – Patrick Budic, **patrick@pmrmarine.com**, 1, 7230 Saint James, Street, Wauwatosa, WI, (414) 456-9300. The customer identification was 9186402, Patrick Budic, **patrick@pmrmarine.com**, (414) 456-9300.

    b.  According to information provided by HostGator on or about August 8, 2016, "pmrmarine.com" had a start date of October 25, 2007, and was due for renewal on October 25, 2016. The customer contact information was: Patrick Budic, **patrick@pmrmarine.com**, 7440 W. Greenfield Ave, Unit 44101, West Allis, WI 53214, (414) 456-9300, Company – PMR Research and Development Group.

67.     Pursuant to preservation letters served upon HostGator, dated March 3, 2016, October 3, 2016, January 11, 2017, and May 1, 2017, HostGator has agreed to preserve data on

34

their servers related to northridgelabs.org. Pursuant to the latest preservation letter, this data will be preserved for a period of 90 days.

68. Pursuant to preservation letters served upon HostGator, dated October 25, 2016, January 11, 2017, and May 1, 2017, HostGator has agreed to preserve data on their servers related to **patrick@pmrmarine.com**. Pursuant to the latest preservation letter, this data will be preserved for a period of 90 days.

69. On November 21, 2016, a representative of HostGator told special agents assigned to this investigation from GSA OIG and DCIS that data related to email accounts **patrick@pmrmarine.com, patrick@northridgelabs.org,** and email accounts ending with @northridgelabs.org was located on a server located in Provo, UT. When asked if the data was located there since the creation of the accounts, the HostGator representative answered that to the representative's knowledge they had not moved servers, but that it was possible that they had their mail elsewhere prior to using HostGator.

## **CONCLUSION**

70. Based on the information stated above, I respectfully submit that probable cause exists to believe that violations of Title 18 USC § 1343 (fraud by wire) and Title 18 U.S.C. § 1001 (false statements) have been committed, and evidence and instrumentalities concerning those violations will be found in information, including the content of communications, further described in Section I of Attachment B, associated with email accounts: **patrick@northridgelabs.org and patrick@pmrmarine.com**, which information is stored at premises owned, maintained, controlled, or operated by HostGator.com LLC, a company that accepts service of legal process at 5005 Mitchendale, Suite 100, Houston, TX 77092, as described in Attachment A.

71. Because the warrant will be served on HostGator who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

# ATTACHMENT A

## Property to Be Searched

Information associated with patrick@northridgelabs.org and patrick@pmrmarine.com that is stored at premises controlled by HostGator.com LLC, a company that accepts service of legal process at 5005 Mitchendale, Suite 100, Houston, TX 77092.

## ATTACHMENT B

### Particular Things to be seized

### I.    Information to be disclosed by HostGator (the "Provider")

To the extent that the information described in Attachment B is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A, from March 2013 to the present:

a.    The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, deleted emails, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, the date on which the account was created, the length of service, the IP address used to register the account, account status, alternative e-mail addresses provided during registration, methods of connecting, and means and source of payment (including any credit or bank account number);

c.    All records or other information stored at any time by an individual using the account, including Web history, address books, contact and buddy lists, calendar data, pictures, and files;

d.    All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

### II.    Information to be seized by the government

All information described above in Section I that constitutes evidence and instrumentalities of violations of Title 18 U.S.C. § 1343 (fraud by wire) and Title 18 U.S.C. § 1001 (false statements) involving patrick@northridgelabs.org and patrick@pmrmarine.com including information pertaining to the following matters:

a.   Communications related to any financial account, record of financial transaction, record of exchange of goods and services, bank and financial institution records, or other records memorializing financial transactions;

b.   Communications related to U.S. Government owned or formerly owned U.S. Government equipment of the type transferred through the GSAXcess and/or the GSA federal excess personal property utilization program;

c.   Communications related to any items or equipment of the type transferred through the GSAXcess and/or the GSA federal excess personal property utilization program bearing U.S. Government or U.S. Government Agency markings;

d.   Communications related to the storage and/or disposition of U.S. Government owned or formerly owned equipment of the type transferred through the GSAXcess and/or the GSA federal excess personal property utilization program;

e.   Photographs and video recordings of US Government owned or formerly owned equipment of the type transferred through the GSAXcess and/or the GSA federal excess personal property utilization program;

f.   Any record related to the acquisition, shipment, movement, exchange, transfer, sale, donation, transportation, maintenance, disposition, and storage of equipment of the type transferred through the GSAXcess and/or the GSA federal excess personal property utilization program;

g.   Any other items, records, or documents related to the acquisition, maintenance, usage, transfer, trade, or sale of U.S. Government owned or formerly owned equipment of the type transferred through the GSAXcess and/or the GSA federal excess personal property utilization program;

h.   Any communication with a U.S. Government agency or subsidiary thereof, related in any way to the U.S. Government's personal property reutilization and donation program, including the GSAXcess and/or the GSA federal excess personal property utilization program;

i.   Northridge National Laboratory communications related to facilities, research plans and projects, personnel, any relationship with the U.S. Government, equipment and assets, financial transactions, and organizational structure and leadership;

j.      Any record related to any status under Section 501(c)(3) of the Internal Revenue Code, and/or related to the non-profit and/or not-for-profit status of Northridge National Laboratory;

k.      Communications related to MST & Associates, Inc., as well as its principals, officers, and representatives;

l.      Communications, documents and profile information, attachments, or other data that otherwise constitutes evidence, fruits, or instrumentalities of violations of Title 18 U.S.C. §1343 (fraud by wire), Title 18 U.S.C. § 1001 (false statements).

m.      Information relating to who created, used, or communicated with the account, including records about their identities and whereabouts.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by HostGator, and my official title is _____. I am a custodian of records for HostGator. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of HostGator, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

     a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

     b.      such records were kept in the ordinary course of a regularly conducted business activity of HostGator; and

     c.      such records were made by HostGator as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____     _____

Date                               Signature